17-289B, Tony Vlesky, et al. receives Memorial Hospital. Would both attorneys that are going to be arguing please step up to the podium and identify yourselves for the record. Dave Wise, W-I-S-E. Good morning. Marnie Slavik for Ingalls Memorial Hospital. All right. Each of you will have about 15 minutes to present an argument. Mr. Wise, from that, you can save out some time for rebuttal. Should I tell you now or just on my own? Whatever. You're going to have time for rebuttal. We're not a group that cuts off people or anything like that. I can't even see my clock lasting 15 minutes. All right. Thank you. You're welcome. You may proceed now. Thank you, Your Honor. May it please the Court? Counsel? Let me ask you a question right at the beginning. Yes, sir. Okay. Normally, on a slip and fall, the defendant has to have notice and knowledge. How do you get around that here? You don't have an expert witness. Donahoe. Pardon? I think this is a Donahoe case. So Donahoe is the Supreme Court case, which gets us away from notice. First, I'll say I'll still argue notice. How is this a Donahoe case? Okay. So Donahoe – sorry, this is too loud. Donahoe talks about if the condition is something that is related to the business of the proprietor, of the company. And Donahoe, admittedly, was an onion that got left on the floor, flopped onto the floor, and someone slipped on it. And most cases following Donahoe are foreign substances on a floor. I think counsel points that out in their brief. Yes, but that's what that case was about, a foreign substance on a floor. Right. And many of the cases following Donahoe are foreign substances on a floor. But there's a number of them that aren't. Mueller, for instance, is a case which is sliding glass doors in a business. And a woman walked through a side panel and, for reasons that nobody was certain of, the sliding door actuated and injured her. So – and Donahoe applied. The court found Donahoe was applicable to that because the doors are part of the purpose. But there was a lot of notice there. There was. Remember? Yes, I do. There was quite a bit. I do. So what I would like to parse out, and I think this is the analysis. Beck, we reversed the trial judge's decision to direct a verdict on the negligence count. And we also indicated that the court should have allowed the evidence of notice. I agree. So how is that a Donahoe case? Well, because I think you're allowed to proceed under both theories, which negligence, a typical 343 case, and Donahoe, which eliminates the need for notice. So those cases, it seems to me, have always been allowed to proceed in parallel. Like Winn v. Iho, I think they both proceeded to the jury. The jury is instructed on both. And there's a number of cases which talk about the jury being instructed on both. So if I were to go negligence under Donahoe, I'm excused from proving notice. If I go 343, then I do need to prove notice, the premises liability. You know, there's a number of asphalt cases where people walk on asphalt and all of a sudden they fall through the asphalt. Sure. And all those cases hold that, you know, without an expert showing that you have to seal it every year, there has to be notice of knowledge. And so, I mean, how do you get around all that law that's been laying there, you know, longer than we've been in Hawaii? Well, I think there's – if we're going to go the notice route and not the Donahoe route, there would be two ways I suspect one could prove notice. One is if there's an expert or professional standard of care about what the inspection should be or what the repair frequency should be. The other one is notice of the condition, whether the condition could occur or the condition did occur, which is not Donahoe. That's a premises liability case. I am of the view that the cases I was reading, and in particular some of the ones cited by the defense, like the Salada case, which admittedly is a federal case with the tile loose at the Coca-Cola facility, the court found – I disagree with it – but the court found that there's no – it's too burdensome on Coca-Cola to check every single tile. Okay. That wasn't an expert standard of care. It wasn't an expert opinion about what the Coca-Cola company should do. So one way to do it would be to have an expert saying how often they should do it. Another would be an internal policy. Did they check it once a week, once a month, once a year? Is that reasonable? Here, nobody checked it. And the reason nobody checked it is because – That's right. That's what they were saying. That's not the entire reason. The actual real reason they didn't check it was because Engels said that they had a contract with Siemens, and Siemens would check it. Siemens said, that's not what the contract means. And the Engels folks were of the view that Siemens was checking that room to make sure it was safe for the Siemens employees. Engels – that was Engels' view. Siemens was like, we never checked that room to make sure it was safe because it's not our room. It was the control was over to Engels. So the question about whether the room had to be checked or not I don't think really is in dispute. The question is who is supposed to do it. The trial court, which I'll get to the procedural issue in a moment, found that there was a duty, and the duty was on Engels. Now, you mentioned, Judge, appropriately so, 30 years perhaps that there had been no problem. It's a plastic step with plastic sticks underneath it that hold it up. If the product had been there for a week and someone got hurt, their argument would be it's brand new. Why are we supposed to check it? Now it's been there 30 years and never checked, and someone gets hurt. At some point, I think it's a question of fact for the jury, but whether or not a suspended floor that's been there and never been checked ever, and both companies think the other company is doing it, somebody should be doing it. And if the property owner, Engels, has a duty, which I think Judge Flanagan pointed out, and the law supports, they have a duty to exercise ordinary care to maintain their property in a reasonably safe condition, and they did zero, they didn't satisfy their duty. They didn't do anything. If they had an inspection process once a year, once every five years, once a week, and they did it, then they would say we did this. We couldn't catch that problem. We couldn't find it. We satisfied our duty. They didn't do that. All right, so you would like us to write a case that would say that there's a duty on a premise liability case for the owner or the controller of the property to inspect the property weekly, monthly? No, no, no. I don't believe this court should do that, and I think that there's a few cases where the courts have kind of gotten into that. The question is, is this a duty? Was there a duty? The duty is to maintain this particular property with ordinary and reasonable care, and what is that is up to the finder of fact as to whether or not they did do that under these circumstances, and there was a point made, I think, in the defense brief about, well, we'll have a bright-line dust test, or like the Coca-Cola case. Does the Coca-Cola case mean that a property owner doesn't have to check if it's a tile or if it's in a bathroom rarely used? No. What I think the court should be doing is pulling back from what is reasonable under the circumstances, leave that to the finder of fact, and simply say, who had the duty? And you do that without an expert. Yes. You're a PI guy. I mean, you know that you use experts. I mean, everybody uses experts to create. You could create this, like a person creating a play or a book. An expert will always find liability. If you want, I think experts are overused. I don't think it's an expert question, though. It's a reasonable care question for a jury. What do you mean? Sorry, Judge. Go ahead. The people who are doing the maintenance aren't experts. They're just people who work at Ingalls. But Ingalls didn't do anything. What do you mean in your brief at page 7 when you say, merely stepping on the floorboard or looking at the plastic support would have discovered the condition? So the floorboard, I think the photos weren't great. I think they were photocopied photos as opposed to laser copied photos. The suspended, are you familiar with what a suspended device is? Yeah. Okay. So these plastic pieces that are underneath it that hold it up, they're like walls, like an egg crate. I think someone mentioned it looked like. So those were broken off. Lifting it up would have shown that. That's one way of looking at it and finding that. The other one is. So the duty that you believe that they have is to go through and open it up and make sure that the underlying supports were all intact. Is that the duty that you think that Ingalls had in this? Yeah. Okay. Yes. And. From time to time. Not every day like this. Okay. Yeah. And once they do that or once we found that they had that duty, isn't it also we would have to say how often that duty. Because you would be coming back here saying, oh, every five years isn't fulfilling your duty. No. I don't think that this court should say. I'm the one who's going to be arguing to the jury that due care requires to figure out if this floor is safe. But I still. You didn't answer my question. Because you say merely stepping on the floor board. Yeah. Or looking at the plastic support would have discovered the condition. There's no evidence in the record that stepping on the floor board would have resulted. Or looking at. You're saying going underneath. But looking at the plastic support would have discovered the condition. But for 30 years, none of this happened. Looking at the floor board or stepping on the floor board. There's no evidence. I guess I'm being unclear. I don't know what you mean. So the squares are two feet by two feet. And there's two in this particular room. If one were to lift it up, then you see the plastic support, the eggshell support underneath. So that's the way by lifting it one would see if they're broken. Stepping on it is the way my client actually got hurt, unfortunately. Well, isn't the question really whether he did get hurt from stepping on it? Because it appears that his testimony was that after he fell, he noticed that there was a piece broken off. Wasn't that the testimony? True. True. Okay. So. So stepping on the floor board. We don't know that it was his stepping on the floor board that caused anything. Do we? You know, I. So this. I agree with how much we're saying is about the question about whether he can personally dispositively prove whether or not stepping that he broke that piece himself or it was already broken. Yeah. I think that there's a circumstantial question there. And here's why I think that. Okay. He has worked in that. I don't know how many years he's worked there. Ten, five, ten. The other guy from Jamerson, Bono, has worked there for 10 or 12 years. Walking on those, simply walking on those doesn't break them apart. Something broke it apart because he'd walk on them countless times. They all have. And they don't break apart. In fact, for 30 years, nothing happened. Something else happened in that room. My guy didn't do it because he didn't do anything other than stepping on it. If it broke apart, it was broken apart. Now, when they asked him, if one looks at the testimony, it starts out with, did you look afterwards? Did you look underneath? Yeah, I did. What did it look like? Well, they were broken parts. Dust. I'll get to the dust in a minute. They looked like they were lying in dust. It didn't look like a new break. Okay. Then they said, well, do you know if it was broken before? He's like, well, I don't know. And he couldn't know. But that's me, and I think it's argument. All right. Let's hear about the dust. Yeah, yeah. Before we get into that, how do you know it's plastic? People testified that it was plastic. Jamerson and Bowens, Mr. Flynn, I think, testified it was plastic. We looked at it. It was plastic. It wasn't Bakelite? Do you know what Bakelite is? I do know what it is. People are using that interchangeably. The answer to that question, Judge, Your Honor, I don't know if it's Bakelite or plastic. Plastic is in use and support. It's Bakelite. Okay. The witness testimony used the phrase plastic. My recollection is it's a hard, and I can't tell you if it was Bakelite or not, because this is not on the record. I went and inspected it, and there's no name of a manufacturer or anything else on it like that. And it's a hard, non-metal, feels like plastic. It could very well be Bakelite. I don't know which exactly it is, but the witnesses testified it was plastic. What was your question again, Ms. Freer? Well, I don't know how merely stepping on the floorboard would have discovered the condition because people had been stepping on it for 30 years, and there was no evidence of stepping would have disclosed there was a problem. That's why I think it wasn't broken for 30 years. You think it wasn't broken? I think it was not broken for 30 years. I think when people are stepping on it, it's stable. And the reason it tilted or cantilevered or teeter-tottered the way you described is because that piece is broken. So stepping on it, if you know, if you're stepping on it, you know you're going to step on it to see if it's there. You won't get hurt and fall down. He didn't know the piece had broken away underneath. But if one's checking it, lifting it, or stepping on it, then one would discover the problem. I think there was a question about a bright line dust test. Again, I don't believe it's the role of the appellate court or, quite frankly, even the trial court to be creating bright line tests for things that are so fact-specific. There's a case I read when I was reading counsel's cases again, and it cited to a case where it was either yogurt or ice cream on the floor, and there was a little bit of a crust around the blop of yogurt or ice cream. And the court's like, well, reasonable minds could conclude that that might have been there for a while. And I don't think we have a yogurt crust bright line test. But under the facts of that case, under the circumstances, that's up to the jury. I think all we have to decide is, is it a Donahoe case or not? Do I need notice or not? Look, if we say it's not a Donahoe case, where are you? Well, then my notice is they have a duty to inspect and then notice. And I'll speak to both of those. The duty to inspect, the Piper case, said that one has to inspect.  If we're going to go down the notice route, the non-Donahoe route, and Piper, that jury instruction was given, and the appellate court said that's appropriate and it should be given, and I pled that they never inspected it, and that's what the evidence shows, they never inspected it. The notice question goes to this dust. When my client said, I looked under there, and it was not a new fracture, it was in dust. Now, you may say, well, what does that exactly mean? That's why it's a fact question. If it's something that the jury's like, that doesn't, we've all seen stuff that's old, like under a bed or something like that, that's been there for a while. We've also seen things you're like, I don't know how long that's been there or not. But Tom Molesky testified, the only one who testified, this is what it looked like to me. And when Ingalls got a hold of it, they took no pictures of it and didn't keep any of the parts or pieces. All I've got is the top piece left, Molesky's uncontradicted testimony, it did not look new to me, it was in dust. So I think that sufficient shows there for a period of time. Not that it's the crusty stuff around the yogurt, like some of the examples, but that's something that a reasonable mind could conclude is sufficient time. But what I would say is it would be, I think it will create a conflict if the court suggests or rules that it cannot be a Donahoe case because it is not a foreign substance on the floor. No, that's not really, I don't think that was what Justice Gordon was suggesting at all. Okay. We're not saying that there can't be a case involving something other than a substance on the floor. But the question is, does that Donahoe case apply? Not because it doesn't involve a substance on the floor. I understand what you're saying, and I'm not here to tell you right or wrong. That I understand. But the defense in their brief said it's not a substance on the floor, therefore it's not a Donahoe case. I don't think that's an accurate interpretation. Anything further at this time? No. All right. We will certainly give you some time for rebuttal. Sladeck? May it please the Court, Counsel? I am here on behalf of Ingalls responding to this appeal, and I think I'd like to start with the room at issue. It is a small telecom room in the basement of Ingalls. And while there is a contract issue between Ingalls and Siemens that existed as to who would operate and maintain the room, that contract issue has absolutely nothing to do with the duty and notice that this case focuses on. In order to have a duty to inspect, as I believe Counsel just suggested we would have, we would have to have notice of something to inspect. We would not go into a room, and I don't know if you saw the photos of where this floor was situated, but it is in between two telecom towers. And this floor runs between the two towers, and underneath this floor are live wires. So Ingalls would not have been in a position at any time to send random staff into this room to manipulate or touch a floor that it does not use for its business in providing medical care, and it would not make... Hang on. Don't those towers service the computers that are used by the hospital? If Ingalls doesn't use them at all, then why are they in the basement? Sure. I'm not following you on that one. Sure. The Donahoe Rule says that if we're going to go down that road, the area or the condition needs to be related to the defendant's business transactions or how we deliver business. Clearly this had nothing to do with our hospital's health care. What does it have to do with it? Every single record in a hospital is contained on the computer. Everything the doctor does now goes to the computer. How can you possibly say that the use of the computer is not related to the hospital business? This isn't the computer. These are simply the wires that are for the telecommunications in the hospital. Okay, so a nurse picks up the phone to call the doctor and tell him he has to come here. That has to do with their business. Sure. And if we were to follow that line, then air conditioning is also part of the hospital and our HVAC system. So if we're going to have a duty to inspect these types of things that are ancillary to our actual business, we would need notice that there was something wrong with our HVAC system. We wouldn't simply inspect it once a day or once a week. We wouldn't inspect our air quality in the hospital as a result of our HVAC system unless we were given some reason, some indication that that was required. Or that there was a defect. Absolutely. And then the second part of Donahoe, that entire line of cases, not only requires that it be part of our business, which I submit it is not, but the second line is that we had to place it there, and not it meaning the floor, but it meaning the dangerous condition itself, that plaintiff would have to prove that the defense somehow contributed to the condition, that we as a hospital system had created. Well, who put the floor in? Well, the plastic 30 years ago was put in as part of the building of these two towers. Right. Who put it in? Well, I do not know what construction company or contractor actually placed the floor. But it was done at the direction of the hospital, wasn't it? I'm certain it would have been done at the direction of the hospital, but again, it's not the floor that needs to be that the defendant put there. It is the dangerous condition needs to have been created in some way by the defendant facility. And in this case, that is the fatal flaw. I feel you've already picked up on it, but the fatal flaw here is there is absolutely not a shred of evidence, no circumstantial evidence to suggest that Ingalls, the hospital system, or any of its personnel would have used, touched, manipulated, or handled this flooring. Did Judge Flanagan say there was a duty to inspect? Judge Flanagan did not say there was a duty to inspect directly. What she indicated was she didn't focus on duty because she felt that there was absolutely no evidence that would link such a duty to causation and damages in this case. She felt she didn't have to analyze the duty portion of this because she knew based on review of Mr. Malevsky's testimony. And I think really the record could stop upon review of Mr. Malevsky's own testimony on this issue. He was on this floor. I just listened to counsel tell you, duty to inspect, and it would have found, had they walked on it, had they looked at it, had they manipulated it, they would have found this. Found what? This gentleman was on this flooring. He was walking on it. He was observing it. That day, the day before, ten minutes prior to his fall, he had walked across the exact same stretch of the floor. So if we are to believe that an inspection would have revealed what? There was nothing to reveal. The man who was working on this floor, the man who was walking on it, using it, who understood its makeup, he didn't find anything wrong. Wasn't it underneath? Isn't that what he said? Well, what he described was that the piece underneath broke, which allowed the floor to sort of give in in a way which allowed his ankle to roll and his knee to hit. So if you can imagine that this plastic flooring has all of these pedestals underneath that raise it where the wires weave in between those pedestals. And so he falls. He's now down. At that point, he lifts the piece of flooring that he has fallen on. And what he sees is that that's dusty and that one of those pedestals that is between the top of that plastic and the floor holding it above the wires looks chipped or broken. He actually says, under direct examination of party admission, do you know whether your fall caused that break? And he says it could have. It could have. His own fall. In other words, there would have been nothing to identify had an inspection been done sooner or earlier. If he didn't even know if this flaw or condition existed ten minutes prior, one minute prior, what would we have found? There was absolutely no evidence of what would or could have been found. I also take issue with the idea that, and I think there's an entire line of cases on this, if the plaintiff doesn't, you know, if they can't discover it, but you should have. And that was an actual quote from the case. And what the case says is if this person that walks on it, uses it, and manipulates it every day couldn't see it, and these are the cases where the woman who walks her dog on the parkway and steps in that same hole, the person who goes to the vestibule of the apartment building that she lives in and is injured, these are places that they go every day. And the court was unwilling to accept the concept that that person never saw it, gave no notice of it, made no complaints, had no idea it existed, but then sued the owner for not knowing that it existed. And the court said, no, we're not going to allow a person to pursue a claim like that and say, I couldn't find it, but you should have. And I think that's exactly what we have here. And I do think the Salada case and the Coca-Cola and that locker room scenario is directly on point because that speaks to floor tiling and the concept of putting on Ingalls a duty to inspect every... Is that an unpublished district court case? It's a federal court case, Judge Salada. It's a federal district unpublished decision. Yes. And what case do they rely on? In Salada, they rely on a string of cases, Judge. And I do think within Salada, they rely on Mueller. Oh, Mueller. Mueller, I apologize, which is a first district court case. And I think Mueller... Whatever. Yes, and I defer to you, Judge. I feel Mueller is a great example of a plaintiff failing this argument. In Mueller, they decided that because the plaintiff had failed to present even a shred of circumstantial evidence, they were not going to allow a jury to decide something where there was no question of fact, where the party, and in this case, Ingalls, there is no question of fact for a jury to decide in this case. And Judge Flanagan rightfully, and I just want to focus very briefly before I conclude, on proximate cause because we cannot visit any of what we already have if we look just at proximate cause in this case. So negligence action, and that's what we have here, a purely pled negligence action, duty, breach, causation, and damages. And if I read Judge Flanagan's opinion correctly, when you look at proximate cause and causation in this case, there's none. And that is based not only on Mr. Malewski's testimony, but the mechanism of his injury. There is no evidence that Ingalls had any impact on this flooring, and certainly no evidence that Ingalls created a condition that caused Mr. Malewski's fall. And that is the fatal and fundamental flaw in this case. Plaintiff is lacking all evidence of causation. And as a result, regardless of duty and regardless of breach, and I suggest to you there's neither, plaintiff cannot prevail as a result of that testimony and the lack of evidence presented on that issue. Anything further? Nothing further. All right. Mr. White. The question on causation is conflicting. He said it was an old break and he didn't break it. They asked, do you know for sure? No, he can't know. If he said, I didn't break it, they'd say he's speculating because he couldn't see it beforehand. Counsel made a point that... Well, what did he say he said to? Is it an old break? Yeah. What did he say? He said, yes, it was old. It was not new. Oh, okay. So then later in the DAPT, they're like, well, do you know you didn't? If it was old and not new, he was repeatedly walking on it, correct, Mr. West? Yes, and thank you for bringing that up. So the eggshell shape, the eggshell shape, if one looks underneath the square, the eggshell has a number of boxes in it and the pieces that were broken off, you'd have to, the easier way to find out would be to lift it up. So you had to hit it at exactly that spot in order for the teeter-totter to... Right. Okay. So he could have been walking on it for years with that. Yes. Yes. He would have to step on the corner piece where that wedge was broken out. There was a point raised, and this was the dog walking case. And this, again, gets into why I think there shouldn't be bright-line tests about what exactly the inspection should be. It's whether the jury decides it's reasonable. So the dog walking case, which counsel pointed out a moment ago, was, well, if that person, because they were walking their dog and they stepped in a hole, the grass had grown over, and the person didn't see it before they stepped on it, and they said, well, if that person can't see it, then how is the homeowner or the condo association supposed to see it? That's an entire outside walkway, huge area, and it couldn't be seen, I guess, unless poking around with a stick. So that argument, and if you make that to the jury, that why would they be expected to see it when you couldn't, is a good point to make, right? And I think that a jury would be well-situated to say, well, there doesn't seem to be, that whatever inspection the condo association did was unreasonable. It wasn't. Here, however, it's not that Tom Olesky couldn't have detected that it was broken underneath. It could have been detected if one lifted and looked. That wasn't his job, and he wasn't the one who was supposed to be doing that. That goes back to an issue that arose earlier before the issue came to your honors about who was supposed to be doing it. And Ingalls said Siemens was supposed to be doing it, and Siemens says, no, we weren't. It was Ingalls. So this could have been detected. It wasn't detected because nobody looked for it. So I think it takes it out of the big, huge expanses of areas, and also the Salatikas, admittedly a federal court case. That was a baffling. I like the dismissive wave that you gave the federal district court on that. We'll make our own bond. We'll make our own bond. Well, it's unpublished, too, isn't it? It might be. I think it's a memorandum of opinion. Our memorandum of order, I'm not sure what it was. I think when I taught last night, it said it was unpublished. Whatever. The thing, like, that was. It's not even a district. No. We're not bound by those. All right. I'll leave it at that. But the facts are so important as to whether or not the property owner's contract was reasonable under the circumstances. That's an unused bathroom and part of the warehouse that nobody went to, and there's who knows how many millions of tiles there are on the floor of the warehouse. Here, there's two tiles that are two square feet on plastic that's never been checked. It's supposed to be checked by somebody. And sooner or later, yeah, you never look at it, so it's going to go wrong. I think the jury would be entitled to say that's not a good way of, that's not reasonable to make sure that your property is safe. And if they choose to say it is reasonable, then that's still their call. But I don't think it's this body's call or even Judge Flanagan's call. And then there was a point, well, they have to have a reason to inspect. That suggests that there's no duty to inspect until somebody gets hurt or until you already see something broken. Well, that kind of defeats the whole point of having the responsibility to make sure that the property is safe. You check to make sure, you check it before it's broken. After it's broken or somebody's hurt and you go fix it, that's not really making your property reasonably safe. That's just fixing it. And they don't get a free bite at the apple. And I can't find a case that says there's no duty to inspect your property until someone gets hurt or until you know there's something wrong. That's not. But what it should be and when a property owner should look and how much they should look and what they should do depends on the place, the location, how often it's being used, by whom it's being used, the people who are using it, inspecting it. I think there was a case. What would a trial judge explain to the jury as far as the duty in this case? I think the trial judge, the duty is just that they exercise reasonable care in maintaining their property. That would be the instruction. I think it's a 2001 instruction. I'm not positive. And then I can make arguments about why it's not reasonable or why it is reasonable. And then the jury can say they are reasonable. And they say this is why we did our hospital this way. This is why it's safe enough. So I think those are the questions. And I don't think that. Thank you. All right. Thanks. Case was well-argued and well-briefed. We're going to take a brief recess to reconfigure our panel for the next argument. Thank you.